IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| WILLIE J. ARMSTRONG HAMILTON, W.C. JONES, CHERYL JENKINS, BRIAN DACUS, ELROY WILLIAMS, DONALD GRIEVES, JOHN LOPEZ, JACK BROWN, JOE GRIEGER, CHERYL PRINCE, and RAYMOND BASS, | ) ) ) ) ) ) ) ) ) | 8:03CV443 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| R. JAMES NICHOLSON, DEPARTMENT OF VETERANS AFFAIRS, AND PAUL PULLUM, | ) ) ) ) | MEMORANDUM AND ORDER |
| Defendants. | ) ) | |

This matter is before the court on the plaintiffs' motion to dismiss or in the alternative motion for summary judgment. Filing No. 77. Plaintiffs filed their Fourth Amended Complaint in this case, Filing No. 42, alleging employment discrimination in violation of Title VII, 42 U.S.C. § 2000e; 42 U.S.C. § 1981; Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791; and the Age Discrimination in Employment Act, 29 U.S.C. § 621. The court has carefully reviewed the record, and the brief in support of the motion to dismiss/summary judgment,[1] and the relevant caselaw. The court finds the motion should be granted and the case dismissed.

---

[1]The court notes that plaintiffs have not filed a response to the motion to dismiss/summary judgment, in spite of their request to extend the deadline and an order granting additional response time. Filing Nos. 81 and 82. The court also notes that plaintiffs are now on their fourth amended complaint; have filed motions to extend response times and motions to extend service of process deadlines too numerous to mention; and have now failed to file a responsive brief or any evidence in opposition to this motion. As the court previously noted, this case is now three years old. There is no excuse for the delays that have occurred in this case.

**Background**

In their fourth amended complaint, plaintiffs contend that plaintiff Hamilton, an African American who is over forty years of age, and all other plaintiffs, most of whom are also African American, were employed by the defendants. The complaint alleges that some of the plaintiffs filed a race claim in 1988 with the Equal Employment Opportunity Commission (EEOC) who found in plaintiffs' favor. At a later time in 1988, Hamilton then filed an EEOC claim alleging retaliation. In 1996, the EEOC directed the defendants to reinstate Hamilton. Hamilton alleges that since returning he has been subject to different terms and conditions of employment. The other plaintiffs allege the same issues have occurred with them. Some of the plaintiffs additionally allege they are disabled and require reasonable accommodations which the defendants have refused to provide to them. Hamilton also claims he has been discriminated against because he is over forty years of age. In addition, plaintiffs contend that defendants have fraudulently misrepresented records to justify their actions against the plaintiffs and further that the defendants have breached a contract with the plaintiffs to provide them certain wages and benefits.

Hamilton's initial employment ended on February 20, 1988 with the VA. He entered into a settlement agreement with the VA on August 3, 2001, and he waived all causes of action in that agreement. Filing No. 78, Pullum Decl. about Hamilton at paras. 22, 23 and Ex. 3.

***Standards of Review***

*A.  Motion to Dismiss*

In reviewing a complaint on a Rule 12(b)(6) motion, the court must consider all of the facts alleged in the complaint as true, and construe the pleadings in a light most

favorable to the plaintiff.  *See, e.g., Brotherhood of Maint. of Way Employees v. BNSF R.R.*, 270 F.3d 637, 638 (8th Cir. 2001).  A dismissal is not lightly granted.  "A complaint shall not be dismissed for its failure to state a claim upon which relief can be granted unless it appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of a claim entitling him to relief."  *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001).  When accepting the facts of the complaint as true, a court will not, however, "blindly accept the legal conclusions drawn by the pleader from the facts."  *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990) (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).  A dismissal under Rule 12(b)(6) is therefore granted "only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief," *Schmedding v. Tnemec Co.*, 187 F.3d 862, 864 (8th Cir. 1999).  The court does not determine whether the plaintiff will ultimately prevail, but rather whether the plaintiff is entitled to present evidence in support of his claim.  *Doe v. Norwest Bank*, 909 F. Supp. 668, 670 (D. Minn.1995).

        *B.  Summary Judgment*

        On a motion for summary judgment, the question before the court is whether the record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir. 1995).  Where unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate.  *Id.*

The burden of establishing the non-existence of any genuine issue of material fact is on the moving party.  Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Therefore, if defendant does not meet its initial burden with respect to an issue, summary judgment must be denied notwithstanding the absence of opposing affidavits or other evidence.  *Adickes*, 398 U.S. at 159-60; *Cambee's Furniture, Inc. v. Doughboy Recreational Inc.*, 825 F.2d 167, 173 (8th Cir. 1987).

Once defendant meets its initial burden of showing there is no genuine issue of material fact, plaintiff may not rest upon the allegations of his or her pleadings but rather must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  *See* Fed. R. Civ. P. 56(e); *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 990 (8th Cir. 1998).  The party opposing the motion must do more than simply show that there is some metaphysical doubt as to the material facts; he or she must show "there is sufficient evidence to support a jury verdict" in his or her favor.  *Id.*  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Facts are viewed in the light most favorable to the non-moving party, "in order to defeat a motion for summary judgment, the non-moving party cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit."  *Carter v. St. Louis University,* 167 F.3d 398, 401 (8th Cir. 1999); *Ghane v. West,* 148 F.3d 979, 981 (8th Cir. 1998).  In ruling on a motion for summary judgment, a court must not

weigh evidence or make credibility determinations.  *Kenney v. Swift Transp. Co.*, 347 F.3d 1041, 1044 (8th Cir. 2003).

Summary judgment should seldom be granted in discrimination cases.  *Heaser v. Toro*, 247 F.3d 826, 830 (8th Cir. 2001).  In passing on a motion for summary judgment, it is not the court's role to decide the merits.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (on motion for summary judgment, district court should not weigh evidence or attempt to determine truth of matter).  The court must simply determine whether there exists a genuine dispute of material fact.  *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1107 (8th Cir. 2000).

### Discussion

The court notes at the outset that plaintiffs have not responded to the motion to dismiss/summary judgment.  The opposing party must "not rest upon the mere allegations or denials...but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."  Fed. R. Civ. P. 56(e).  In addition, the local rules require the party opposing a motion for summary judgment to file a brief in response and to note disagreements with the evidence or to provide other evidence upon which the opposing party relies.  NeCivR 56.1(b)(1).  Failure to do so will result in the court finding that movant's statements are admitted as true.  For this reason alone, the court grants defendants' motion for summary judgment.  Plaintiffs have failed to prosecute this case from its inception.  Defendants filed significant evidence in support of their motion.  The court granted plaintiffs' counsel additional time to respond to this motion.  Plaintiffs did not

so respond.  Even though the court dismisses the case for failure to comply with the federal and local rules and failure to produce any evidence in opposition, the court will briefly address the merits of defendants' motion to assure that summary judgment is appropriate.

Defendants first argue that plaintiffs have failed to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6) or because no material issue of fact exists under Fed. R. Civ. P. 56.  Defendants contend that agency employees, in their individual capacities, cannot be held liable under Title VII, the Rehabilitation Act or the ADEA.  42 U.S.C. § 2000e-16(c).  *Warren v. Dep't of the Army*, 867 F.2d 1156, 1158 (8th Cir. 1989); *Johnson v. U.S. Postal Service*, 861 F.2d 1475, 1478 (10th Cir. 1988) (Rehabilitation Act); *Williams v. U.S. Postal Service*, 1991 WL 629788 at *4 (E.D.N.C. Feb. 21, 1991) (Title VII); *Ellis v. U.S. Postal Service*, 784 F.2d 835, 838 (7th Cir. 1986) (ADEA and Title VII).  The court agrees that agency employees, in their individual capacities, cannot be held liable. *Mathis v. Henderson*, 243 F.3d 446, 449-451 (8th Cir. 2001) (when plaintiff's state law claims against supervisor were pre-empted by her Title VII claims against the agency, the claims against the supervisor had to be dismissed, as he was immune from suit individually); *Hall v. Small Bus. Admin.*, 695 F.2d 175, 180 (5th Cir. 1983) (under Title VII, there was no cause of action against the Small Business Administration's regional or district director).  Plaintiffs named Paul Pullum, Staff Attorney for the VA Omaha office, as a defendant in this action.  However, the court finds  the only proper defendant in this suit is Secretary of the Department of Veterans Affairs, R. James Nicholson, and because Pullum cannot be held liable under Title VII, the Rehabilitation Act, or the ADEA, Pullman is dismissed from this action.

6

Defendants next argue that plaintiffs failed to exhaust their administrative remedies. Failure to do so, argues defendants, bars a claim in federal court. *Brown v. GSA*, 425 U.S. 820, 832 (1976); *Briley v. Carlin*, 172 F.3d 567, 571 (8th Cir. 1999); *McAdams v. Reno*, 64 F.3d 1137, 1141 (8th Cir. 1995); *Morgan v. United States Postal Service*, 798 F.2d 1162, 1165 (8th Cir. 1986). Defendants contend that plaintiffs Jenkins, Dacus, Williams, Bass, Brown, Grieger, Jones, Lopez, Grieves[2], and Prince did not file with an EEO counselor nor file a formal complaint with the EEOC. The court has carefully reviewed these arguments and the evidence presented by the defendants and agrees with the defendants. Plaintiffs failed to properly exhaust their administrative remedies. See Filing No. 78. These procedures are a prerequisite to a lawsuit in federal court. Accordingly, the court finds such failure bars plaintiffs' claims in this lawsuit.

Defendants also argue that summary judgment should be entered as to Hamilton's claims. Hamilton raised discrimination claims in 1998 and 2003. The court agrees with the defendants that there is no showing that these earlier claims by Hamilton are properly before the court.[3] After losing the later claim at the administrative level, Hamilton did not file with the EEOC. Consequently, Hamilton has not exhausted his administrative remedies either. Accordingly, the court finds Hamilton's claims are without merit.

Defendants also argue that the fraud and misrepresentation, falsification of records, and contract claims should be dismissed, as Title VII is the exclusive remedy for federal

---

[2]Additionally, Grieves is apparently Caucasian, and there is no evidence on the record that reverse discrimination occurred.

[3]As previously discussed herein, Hamilton signed a settlement agreement with the defendants. This agreement fully settled all claims up and through August, 2001. For this reason, Hamilton's claims through August, 2201, are also barred.

employees who allege race, color, national origin, age or rehabilitation discrimination in the workplace. *Brown*, 425 U.S. at 832-35; *Johnson*, 861 F.2d at 1477 ; *Purtill v. Harris*, 658 F.2d 134, 137-38 (3rd Cir. 1981).  Accordingly, defendants argue that these claims must be dismissed.  In addition, defendants argue that plaintiffs have not identified an express contract of employment with the defendants.  The court agrees, and for the reasons set forth herein, plaintiffs' claims must fail.

In conclusion, the court dismisses defendant Pullum from this case pursuant to Fed. R. Civ. P. 12(b)(1) as he is not a proper defendant.  Further, the court enters summary judgment in favor of the defendants with respect to all other claims herein.

THEREFORE, IT IS ORDERED:

1.  Defendants' motion to dismiss or for summary judgment, Filing No. 77, is granted and this case is dismissed.

2.  A separate Judgment shall be entered in accordance with this Memorandum and Order.

DATED this 12th day of March, 2007.

BY THE COURT:


s/ Joseph F. Bataillon
JOSEPH F. BATAILLON
Chief Judge

8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| PENNFIELD OIL COMPANY, | ) | |
| | ) | 8:05CV315 |
| | ) | |
| Plaintiff/Counterclaim | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND ORDER |
| | ) | |
| | ) | |
| AMERICAN FEED INDUSTRY | ) | |
| INSURANCE COMPANY RISK | ) | |
| RETENTION GROUP, INC., | ) | |
| | ) | |
| Defendant/Counterclaim | ) | |
| Plaintiff. | ) | |

This matter is before the court on the parties cross-motions for summary judgment. Filing Nos. 43 and 48. This is an action for declaratory judgment under 28 U.S.C. § 2201. Jurisdiction is premised on diversity of citizenship under 28 U.S.C. § 1332. The parties seek a determination of their rights and responsibilities under certain policies of insurance issued to Pennfield Oil Company ("Pennfield" or "the insured") by American Feed Industry Insurance Company Risk Retention Group, Inc. ("American Feed" or "the insurer").

Pennfield seeks a declaration that American Feed has a duty under the policies to defend Pennfield in an action filed against it in this court, *Alpharma Inc. v. Pennfield Oil Co.,* No. 8:03-CV-401 (D. Neb) ("the underlying litigation"), as well as in related proceedings before the Food and Drug Administration ("the FDA proceedings"). Pennfield also seeks attorneys' fees and the costs of this action under NEB. REV. STAT. § 44-359. American Feed denies that it has a duty to defend or indemnify Pennfield for the loss and has filed a counterclaim seeking a declaration that its policies do not cover the alleged loss. Both parties move for summary judgment, each asserting that it is entitled to judgment as

a matter of law.  The parties have filed briefs and evidence in support of their respective positions.  Filing Nos. 44, 45, 49, 50, and 55.

## I.  BACKGROUND

### A.  Procedural History

Some additional relevant facts are set out in the Eighth Circuit Court of Appeals' opinion reversing this court's dismissal of the underlying action for failure to exhaust administrative remedies and need not be repeated here.  *See Alpharma v. Pennfield Oil Co,* 411 F.3d 934 (8th Cir. 2006).  Briefly, the underlying action is a suit by Pennfield's competitor, Alpharma Inc., asserting claims for violations of the Lanham Act, 15 U.S.C. § 1125(a), and the Nebraska Uniform Deceptive Trade Practices Act, NEB. REV. STAT.§§ 87-301 to 87-306, unfair competition, and unjust enrichment in connection with Pennfield's allegedly false advertising and promotion of one of its products as approved for certain uses by the Food and Drug Administration (FDA).  Specifically, Alpharma alleges that Pennfield falsely advertised that its animal-drug-feed-additive, known as Bacitracin MD ("BMD") and marketed as Penntracin MD 50-G, was approved by the FDA for a number of uses for which it had not been approved.  Alpharma also seeks injunctive relief, compensatory and punitive damages, fees and costs in the underlying action.  *See* Filing No. 45, American Feed Index of Evid., Ex. B, Complaint.

Alpharma alleges that Pennfield disseminated the false assertion that it had FDA approval for multiple uses in advertising and loose-leaf inserts, as well as in its labeling and in entries it made in trade publications.  *Id.* at 4-7.  It asserts that Pennfield's actions have resulted in Alpharma's lost sales, profits and good will.  *Id.* at 12.  It contends that it was injured by the false representations because Alpharma is the only entity with FDA approval

2

for multiple uses.  *Id.* at 11.  Alpharma also alleges that Pennfield's misrepresentations were made "intentionally, willfully, deliberately, maliciously, egregiously, and in bad faith." *Id.* at 14.

The record shows that in May 2003, prior to filing suit in this court against Pennfield, Alpharma filed an action against the Commissioner of the Food and Drug Administration in the United States District Court for the District of Maryland seeking a declaration that the FDA had unlawfully granted Pennfield approval to sell BMD or "unlawfully facilitated Pennfield's false representation of FDA approval for BMD."  Filing No. 45, American Feed Index of Evid., Ex. L, Complaint at 8, 14; *Alpharma, Inc. v. McClellan,* No. 03CV1406, Filing No. 1, Complaint (D. Md. May 13, 2003) (hereinafter, "the Maryland action").  The Maryland action was later dismissed pursuant to a stipulated order, wherein the FDA agreed that its records did not show that Pennfield's predecessor had been approved for multiple uses, but that the issue had been opened for comment and rulemaking.  *See* Filing No. 45, Ex. M, Stipulation and Order at 3-4; *Alpharma, Inc. v. McClellan,* No. 03CV1406, Filing No. 15, Order at (D. Md. August 15, 2003); *see also Alpharma, Inc. v. Pennfield,* 411 F.3d at 939. Pennfield was not a party to the litigation, although Alpharma's complaint specifically referred to Pennfield's advertisements for and promotion of its BMD product in the marketplace.  Filing No. 45, American Feed Index of Evid., Ex. L, Complaint at 12-14; *Alpharma, Inc. v. McClellan,* No. 03CV1406, Filing No. 1, Complaint at 12-14.

As stated in the stipulated order, the FDA initiated proceedings for review of FDA approval by issuing a Notice and Opportunity for a Hearing and Notice of Proposed Rulemaking ("NOOH").  *See* 68 Fed. Reg. 47237 (Aug. 8, 2003); Filing No. 45, American Feed Index of Evid., Ex. N, FDA Notice.  The FDA proposed withdrawal of the New Animal

3

Drug Application ("NADA"), NADA 141-137, that applied to Pennfield's BMD product. *Id.* at 47333. The record shows that the FDA's action was provoked by the concerns raised by Alpharma in the Maryland litigation. *See id.* at 47333-34. On September 18, 2003, Alpharma issued a press release stating that "Alpharma is the sole manufacturer of Bacitracin methylene disalicylate" and "Alpharma sees this swift federal court action supporting the FDA's limit on the claims our competitor can make as an important victory." Filing No. 50, Pennfield Index of Evid., Ex. 3. Shortly thereafter, on September 30, 2003, Alpharma filed the underlying action in this court.

Pennfield responded to the NOOH by entering an appearance in the FDA proceeding. It retained a Washington, D.C., law firm to represent its interests and requested a hearing before the FDA. See Filing No. 45, American Feed Index of Evid., Exs. O, P, R (letter briefs submitted to FDA). On November 6, 2003, Alpharma filed a citizen petition with the FDA seeking a determination that "the FDA does not have sufficient evidence to establish that Pennfield or its predecessor ever had appropriate FDA approval of a BMD product." *Id.,* Ex. Q.

Both the Maryland case and the FDA proceeding are referred to and relied upon in Alpharma's complaint in the underlying action. *See* Filing No. 1, Complaint at 3 (alleging that the FDA stipulated in the Maryland action that Pennfield did not have FDA approval and acknowledging the pendency of FDA proceedings). Pennfield moved to dismiss Alpharma's complaint in the underlying action, alleging that the FDA was the proper forum in which to address the issues. *See Alpharma, Inc. v. Pennfield,* No. 8:03CV401, Filing No. 26, Motion to Dismiss. On July 13, 2004, this court ruled that Alpharma's failure to exhaust remedies in the FDA proceeding required dismissal. *Id.,* Filing No. 49, Memorandum and

4

Order at 4.  That finding was reversed by the Eighth Circuit.  *See id.,* Filing No. 58, Opinion at 7-8; *Alpharma, Inc. v. Pennfield Oil Co.,* 411 F.3d at 941.  The circuit court confirmed the viability of a Lanham Act false advertising claim.  *Id.* at 940-41.  It further found that "[t]he question of whether Pennfield's BMD has been approved as safe and effective is much different from the question of whether Pennfield's BMD should be approved as safe and effective, and it is only the latter that requires the FDA's scientific expertise."  *Id.* at 939.

### B.  Insurance

In 2003, American Feed issued a Commercial General Liability Policy ("CGL policy"), No. AFI 03 003, a first-level Excess Policy, No. AFI 03 5003, and a Second-Level Excess Policy, No. AFI 03 5501, to Pennfield.  See Filing No. 45, American Feed's Index of Evidence, Exs. C - E.  Those policies were effective through April 1, 2004.  *Id.*  The policies were later renewed to provide coverage through April1 2006.[1]  *Id.,* Exs. F - K.

The CGL policies provide liability coverage to Pennfield for suits involving "bodily injury," "property damage," "personal injury" and "advertising injury."  *See, e.g., id.,* Ex. C, §§ IA(1)(a) & 1B(1)(a).  Similarly, the CGL policies provide that American Feed "will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'advertising injury' to which this insurance applies" and American Feed "will have the right and duty to defend any 'suit' seeking those damages."  *Id.* at IB(1)(a).  The policies further provide "[t]his insurance applies to advertising injury' only if caused by an offense

---

[1]The subsequent policies are substantively identical to the 2003 CGL and excess policies.  For ease of reference, the court will cite only provisions in the 2003 policy.  There are identical provisions in the later policies.

committed . . . in the course of advertising your goods, products or services." *Id.,* Ex. C at IB(1)(c). "Advertising injury" is defined in the policy as:

> injury arising out of . . . oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; oral or written publication of material that violates a person's right of privacy; misappropriation of advertising ideas or style of doing business; or infringement of copyright title or slogan.

*Id.*, § V(1)(a)-(d). "Suit" is defined as "a civil proceeding in which damages because of 'bodily injury,' 'property damage,' 'personal injury' or 'advertising injury' to which the insurance applies are alleged" and includes "an arbitration proceeding alleging such damages to which you must submit or submit with our consent." *Id.,* § V(13).

The policies exclude damages for personal injury or advertising injury "arising out of oral or written publication of material if done by or with direction of the insured with knowledge of its falsity"; or "arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured." *Id.,* § IB(2)(a)(1) & (3). The policy also excludes damages for advertising injury arising out of "the failure of goods, products, or services to conform with advertised quality or performance. . . ." *Id.,* § IB(2)(b)(2). The excess policies provide coverage up to the limit of liability for damages that exceed the retained limit as stated in the declarations of the policies. *See, e.g., id.,* Ex. D, § IA. The excess policies also contain exclusions similar to those in the CGL policies. *See id.,* § IB.

On November 7, 2003 , Pennfield provided notice to American Feed of a "claimable occurrence" under the advertising injury coverage of the policies. Filing No. 45, American Feed Index of Evid., Ex. S. The complaint in the underlying action was forwarded to American Feed several days later. *Id.,* Ex. T. American Feed acknowledged receipt of the Alpharma claim, but reserved its rights pending completion of a coverage determination.

*Id.,* Ex. U.  In correspondence dated December 9, 2003, American Feed denied liability coverage for the claims asserted in the underlying litigation.  *Id.,* Ex. V.  Pennfield then wrote to American Feed expressing disagreement with the coverage determination and furnishing additional documentation.  *Id.,* Ex. W.  American Feed reaffirmed its position that its policies did not provide coverage, but acknowledged that a "fairly debatable issue exists as to whether Pennfield Oil Company had FDA approval" and that the "issue of FDA approval is significant because it may impact on the availability of several policy defenses raised in our denial of coverage. . . ."  *Id.,* Ex. X at 1.  American Feed therefore agreed to assume Pennfield's defense in the underlying litigation, subject to a complete and full reservation of its rights under the policy.  *Id.* at 1-2.  American Feed further agreed to Pennfield's retention of the Fitzgerald, Schorr, Barmettler, & Brennan, P.C., L.L.O., law firm ("the Fitzgerald firm") to represent Pennfield in the litigation, subject to the proviso that "they can separate the defense costs of the Alpharma lawsuit and Pennfield's endeavor to clarify any misunderstanding or understanding with the FDA," but did not agree "to pay for any legal expenses incurred by the Washington, D.C. lawyers, or any other organization related to FDA'a approval or disapproval of the product Penntracin MD 50-G."  Ex. X at 2.

Pennfield responded challenging American Feed's limitation of defense costs and contending that Washington, D.C., counsel had been materially and principally involved in the defense of the underlying suit through its representation in the Maryland and FDA actions.  Filing No. 50, Pennfield Index of Evid., Ex. 6.  On March 17, 2005, Pennfield presented a claim in the amount of $920,959.48 to American Feed "for the legal costs and expenses incurred by Pennfield Oil Co. through both Omaha and District of Columbia counsel to defend the suit by Alpharma in the U.S. District Court of Nebraska and in the

Eighth Circuit Court of Appeals and the attack of the Food and Drug Administration ("FDA") encompassed in their Notice of Opportunity for Hearing based upon claims of misrepresentation and misleading statements in the advertising and marketing of Pennfield Products through Pennfield brochures, labeling and other promotional materials."  Filing No. 45, American Feed Index of Evid., Ex. Y.  American Feed declined to cover defense costs for east coast counsel and for fees incurred in connection with the FDA proceeding, and filed its counterclaim in this action.  *Id.,* Ex. Z; Filing No. 7, Answer and Counterclaim.

American Feed first contends that it is entitled to summary judgment in its favor on the coverage issue.  It contends that Alpharma's complaint in the underlying action does not allege either "personal injuries" or "advertising injuries" within the meaning of the policies.  It argues that violations of FDA policy or of the Lanham Act do not constitute personal or advertising injuries, nor do claims for unjust enrichment or unfair competition. It also argues that Pennfield's product labels, brochures, and advertisements do not "disparage" Alpharma's goods, products or services.  Alternatively, it argues that the allegedly misleading materials come within the policies' exclusions of advertising injury damages "that arise out of the failure of goods, products or services to conform with advertised quality of performance" and exclusion of intentional torts.  It further argues that it has no duty to defend in the FDA proceeding, arguing that the proceeding is administrative or regulatory and is not a civil action that comes under its duty to defend against "suits."

Pennfield argues that the allegations of the underlying lawsuit, including the FDA proceedings, come within the coverage and defense provisions of the policies.  It contends that Alpharma's complaint alleges that Pennfield's advertisements disparage Alpharma's

8

product and constitute misappropriation of Alpharma's style of doing business.   It further argues that American Feed has a duty to defend in the FDA proceeding because the action was instigated by Alpharma as part of its overall action to stop Pennfield from selling BMD. Pennfield contends that the defense of its FDA license to sell BMD in the FDA proceeding was critical to its defense of the underlying lawsuit.  Further, it asserts that American Feed had notice of the FDA proceedings because the FDA action is referenced in the complaint in the underlying action.

## II.  DISCUSSION

### A.  Law

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Harder v. ACANDS*, Inc., 179 F.3d 609, 611 (8th Cir.1999).   Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations.  *Kenney v. Swift Transp. Co.*, 347 F.3d 1041, 1044 (8th Cir. 2003).  Where unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate.  *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir. 1995).

A federal court exercising diversity jurisdiction construes an insurance contract in accordance with state law.  *Langley v. Allstate Ins. Co.*, 995 F.2d 841, 844 (8th Cir. 1993)

("when federal courts are exercising diversity jurisdiction, the rules for construing insurance policies are controlled by state law").  In this case, the laws of Nebraska apply since the policy was issued to corporations based in Nebraska.  *See Avemco Ins. Co. v. Auburn Flying Serv.*, 242 F.3d 819, 821 (8th Cir. 2001).

An insurance policy is a contract.  *Callahan v. Washington Nat. Ins. Co.*, 608 N.W.2d 592, 597 (Neb. 2000).  The construction of an insurance contract is purely a question of law.  *Union Ins. Co. v. Land and Sky, Inc.*, 529 N.W.2d 773, 776 (Neb. 1995); *see also United Fire & Cas. Co. v. Gravette*, 182 F.3d 649, 654 (8th Cir. 1999) (holding that the construction and legal effect of a written contract are generally questions of law).

A plaintiff must allege a "justiciable controversy" in order to state a claim for declaratory relief.  *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273-74 (1941); *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239-42 (1937).  In order to present a "controversy," a question must not be abstract but must define an issue that is concrete and specific. *Cass County v. United States,* 570 F.2d 737, 740 (8th Cir. 1978).

Courts have consistently allowed insurers to sue insureds—prior to resolution of the underlying action—in order to obtain a declaration of coverage.  *See, e.g., Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. at 273-74.  A clear demand for payment of defense and indemnity costs under an insurance policy and the dispute of those demands by an insurer presents a "live justiciable controversy between the parties sufficient to invoke the jurisdiction of the district court," even in the absence of an underlying judgment on liability. *Aetna Cas. and Sur. Co. v. General Dynamics Corp,* 968 F.2d 707, 711 (8th Cir. 1992); *Capitol Indem. Corp. v. Miles,* 978 F.2d 437, 438 (8th Cir. 1992) (noting that with demand and refusal, "[t]he lines are drawn, the parties are at odds, the dispute is real").  However,

10

a declaratory judgment action cannot be used to decide the legal effect of a state of facts that are future, contingent or uncertain. *Union Ins. Co. v. Land & Sky, Inc.,* 529 N.W.2d 773, 778 (Neb. 1995). Only when the issue of coverage under the policy can be determined independently of the insured's underlying liability is a declaratory judgment with respect to coverage appropriate. *Allstate Ins. Co. v. Novak*, 313 N.W.2d at 639.

Under Nebraska law, courts must construe insurance policies to "give effect to the parties' intentions at the time the contract was made." *Katskee v. Blue Cross/Blue Shield of Neb.*, 515 N.W.2d 645, 649 (Neb. 1994). An insurance contract will be interpreted in accordance with the reasonable expectations of the insured at the time of the contract and, in case of doubt, the policy will be liberally construed in favor of the insured. *Hemenway v. MFA Life Ins. Co.,* 318 N.W.2d 70, 74 (1982). A contract must be construed as a whole, and if possible, effect must be given to every part thereof. *Baker's Supermarkets, Inc. v. Feldman*, 502 N.W.2d 428, 433 (Neb. 1993).

In discerning the parties' intentions, courts should first determine as a matter of law whether a policy is ambiguous. *Katskee,* 515 N.W.2d at 649. An insurance policy is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Poulton v. State Farm Fire and Cas. Companies*, 675 N.W.2d 665, 673 (Neb. 2004). If a court concludes that a policy is ambiguous it "may employ rules of construction and look beyond the language of the policy to ascertain the intention of the parties." *Katskee,* 515 N.W.2d at 649.

However, if a court determines that a policy is not ambiguous then it "may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as the ordinary or reasonable person would understand them." *Id.* In such a case, a court

11

shall seek to ascertain the intention of the parties from the plain language of the policy. *Id.* When interpreting the plain meaning of the terms of an insurance policy, a court prefers "the natural and obvious meaning of the provisions in a policy" over a "fanciful, curious, or hidden meaning." *Id.* An ambiguous insurance policy will be construed against the drafter, but ambiguity will not be read into policy language that is plain and unambiguous in order to construe the contract against its preparer. *Poulton,* 675 N.W.2d at 673.

The burden of proving coverage under a policy is on the insured. *Farm Bureau Ins. Co. of Nebraska v. Martinsen*, 659 N.W.2d 823, 827 (Neb. 2003). However, the burden to prove that an exclusionary clause applies rests on the insurer. *Farmers Mut. Ins. Co. of Nebraska v. Kment*, 658 N.W.2d 662, 667 (Neb. 2003). Exclusionary clauses will be liberally construed in favor of the insured. *See, e.g., Modern Sounds & Systems, Inc. v. Federated Mut. Ins. Co.*, 262 N.W.2d 183, 187 (Neb. 1978) (broadly interpreting theft coverage and narrowly construing a conversion exclusion so as to provide coverage).

In Nebraska, an insurer's duty to defend is distinct from and broader than its duty to indemnify. *Allstate Ins. Co. v. Novak*, 313 N.W.2d 636, 638 (1981); *Chief Indus., Inc. v. Great Northern Ins. Co.*, 612 N.W.2d 225, 230 (Neb. 2000) (noting "the duty to defend can exist separate and apart from the duty to provide coverage"). An insurer must defend its insured when: (1) the allegations in the petition, if true, would obligate the insurer to indemnify the insured or (2) a reasonable investigation of the facts by the insurer would, or does, reveal facts that would obligate the insurer to indemnify the insured. *Mapes Indus., Inc. v. United States Fid. & Guar. Co.*, 560 N.W.2d 814, 817 (Neb. 1997); *Novak*, 313 N.W.2d at 641-42. "Thus, in determining its duty to defend, an insurer not only must look to the petition, but must investigate and ascertain the relevant facts from all available

sources." *Mapes Indus.*, 560 N.W.2d at 817. *See also Neff Towing Serv., Inc. v. United States Fire Ins. Co.*, 652 N.W.2d 604, 610 (Neb. 2002). Once a complaint states one claim that is potentially within the policy's coverage, the insurer has a duty to accept defense of the entire lawsuit even though other claims in the complaint may fall outside of the policy's coverage. *Babcock & Wilcox Co. v. Parsons Corp.*, 430 F.2d 531, 537 (8th Cir. 1970) (applying Nebraska law).

Advertising injury is generally understood to include claims for certain offenses, such as defamation, invasion of privacy, "misappropriation of advertising ideas or style of doing business," and "infringement of copyright, title, or slogan." *See, e.g., Nationwide Mut. Ins. Co.,* 753 F. Supp. 853, 857 (N.D. Cal. 1990) (noting that "advertising injury offenses include identified common law torts such as libel, slander, defamation and piracy" as well as unfair competition as it pertains to "legal rights among business rivals," interpreted under "the common law definition relating to the taking and using as one's own that which belongs to one's competitor"); *see also John Markel Ford, Inc. v. Auto-Owners Ins. Co.*, 543 N.W.2d 173, 179 (Neb. 1996) (identifying common law tort of unfair competition "alongside a host of readily identified common law torts including libel, slander, defamation and piracy"). To come within an advertising injury provision in a CGL policy, a lawsuit "must have been related to the defendant's advertising activities and must have arisen out of one of the acts enumerated in the endorsement, i.e., unfair competition." *See, e.g., John Markel Ford, Inc.,* 543 N.W.2d at 177-78.

When a policy does not further define terms such as "unauthorized taking of advertising ideas," "infringement" in an advertising injury provision of a CGL policy, "those terms must be understood in their plain and ordinary meaning under [applicable] law, and

cannot be given a technical meaning." *American Simmental Ass'n v. Coregis Ins. Co.,* 282 F.3d 582, 587 (8th Cir. 2002). "The plain and ordinary meaning of 'advertising idea' generally encompasses 'an idea for calling public attention to a product or business, especially by proclaiming desirable qualities so as to increase sales or patronage.'" *Id.* (quoting *Advance Watch Co., Ltd. v. Kemper Nat. Ins. Co.,* 99 F.3d 795, 801 (6th Cir.1996)); *Hyman v. Nationwide Mut. Fire Ins. Co.,* 304 F.3d 1179, 1188 (11th Cir. 2002) (Florida law) ("An 'advertising idea' can be any idea or concept related to the promotion of a product to the public"). The words "unfair competition" relate to conduct that a reasonable layperson would consider competition that is unfair—in general, the conduct encompassed by the common law tort of unfair competition. *John Markel Ford, Inc.,* 543 N.W.2d at 178 (holding that "unfair competition" does not refer to conduct prohibited by consumer protection statutes).

## B. Analysis

### 1. Duty to Defend

#### a. The Underlying Action

The court rejects American Feed's contention that the underlying complaint does not allege an "advertising injury." Alpharma's complaint in the underlying action alleges an injury that could arguably come within the coverage of the policy. The heart of the issue is Pennfield's dissemination of allegedly misleading advertisements and materials that allegedly hurt Alpharma's sales, profits and good will. The advertisements and materials at issue implicitly disparage Alpharma's product because Alpharma is the only other manufacturer of the product with FDA approval. Also, Pennfield's representation of FDA approval is arguably a misappropriation of Alpharma's advertising ideas or style of doing

14

business.   Accordingly, Alpharma's complaint in the underlying lawsuit states at least one claim that is potentially within the policies' coverage, and the court finds that American Feed has a duty to accept defense of the underlying action even though other claims in the complaint may fall outside of the policies' coverage.

Moreover, American Feed has not sustained its burden to show as a matter of law that the policies exclusions eliminate its coverage or duty to defend.   American Feed contends its policies' exclusion of an advertising injury that "arises out of the failure of goods, products, or services to conform with advertised quality or performance" applies. This provision purports to exclude false claims about the insured's own products. However, the injuries excluded by the clause are limited to those caused by a claim that the company's product did not conform with its advertised quality or performance. Alpharma's complaint does not allege such a claim.  Alpharma's alleged injury is due to Pennfield's implicit disparagement of Alpharma's product and practices.  Alpharma's injury – lost sales, profits and goodwill – would not be remedied if Pennfield's products were to conform to the allegedly false advertised quality.  Accordingly, the court finds the failure to conform exclusion does not apply.

American Feed also contends that the policy exclusion for personal or advertising injury "arising out of oral or written publication of material if done by or with direction of the insured with knowledge of its falsity" applies.   Determination of the applicability of that provision must await further factual development in the underlying action.  A determination that coverage is excluded by that provision would be premature at this time.  Although the complaint alleges intentional and malicious acts, the record in the FDA proceedings shows

that there is at least a colorable argument that Pennfield's allegedly false representations were either made without knowledge of falsity or were not false.

Assumption of the defense of the FDA proceedings is more problematic, however. The record shows that although the FDA proceedings may be connected to the underlying action, the proceedings are not inextricably intertwined with the underlying action. The FDA action is not exclusively bound to the underlying action. Pennfield's participation in the FDA proceeding, a regulatory action, can be characterized as one of Pennfield's costs of doing business and is in the nature of an operating expense. Regardless of whether the Alpharma suit had been filed, Pennfield would have had to establish or clarify its status with respect to FDA approval in order to market and sell its product for the uses it desired. Its appearance in the regulatory proceeding was not an appearance in a civil action as that term is commonly understood.

Moreover, the policies require notice of the suit to be tendered to American Feed. Notice was tendered to American Feed upon the filing of the Nebraska action, not at the time Pennfield entered its appearance in the FDA proceedings. On a proper showing, however, American Feed may be responsible for reimbursement of fees for services rendered by Washington, D.C., counsel, if those fees were incurred for services rendered by Washington, D.C., counsel in the Nebraska litigation before American Feed assumed the defense and retained the Fitzgerald law firm.

### b.  Coverage

The court finds there are genuine issues of material fact with respect to American Feed's coverage of any potential award to Alpharma in the underlying action. As discussed above, resolution of the issue of coverage, except as it applies to the issue of

American Feed's duty to defend, is premature at this time.  The record in the FDA proceeding shows that there are genuine issues of material fact with respect to whether Pennfield's representations that it had FDA approval were actually false, whether they were made knowing they were false, whether Pennfield could reasonably rely on the FDA's actions as arguably constituting approval, and the extent of any such approval.

IT IS ORDERED:

1.  Pennfield's motion for summary judgment on the issue of defendant's duty to defend is granted with respect to proceedings in *Alpharma Inc. v. Pennfield Oil Co.*, No. 8:03cv401, and is denied with respect to proceedings at the Food and Drug Administration.

2.  American Feed's motion for summary judgment in its favor is denied.

DATED this 12th day of March, 2007.

BY THE COURT:


s/ Joseph F. Bataillon
JOSEPH F. BATAILLON
UNITED STATES DISTRICT JUDGE

17